DECISION
I Background
The Appellant, Mr. Lester W. Harms III, has appealed the decision of the Oneida Police Commission that upheld his termination to the Oneida Tribal Judicial System Appeals Court. This termination was issued after Officer Harms failed to report an incident of child abuse to Indian Child Welfare and his misconduct in the arrest of Mr. Hampton from Indian Child Welfare for Obstruction of an Officer. A complaint was filed by Mr. Hampton and his supervisor, Ms. Tousey, which resulted in an investigation that led to Harms termination. The termination was upheld by the Police Chief and Police Commission and now is upheld by the Oneida Tribal Judicial System Appeals Court.

A. Factual Background.

This case arose when Appellant, Officer Harms was dispatched to the residence of Sandra Hawpetos on April 2, 2008 to investigate a child out of control. Upon arrival, he witnessed Ms. Hawpetos pick *99 up the ehild and “slam” him to the floor. This incident was not reported to Indian Child Welfare. Standard operating procedure for the Oneida Police Department is to report such incidents. This incident was followed by a repeat visit to the same residence on April 10, 2008 because of a child out of control. At this time, Officer Harms also met others at the residence including Harold Hampton from the Oneida Indian Child Welfare Department who, Harms was told, was made aware by the child’s caseworker of a prior incident of abuse. Officer Harms then questioned Mr. Hampton about this incident, but he denied that he had been told about this prior abuse. Mr. Hampton was then placed under arrest by Officer Harms and booked for Obstruction of an Officer.
On April 14, 2008, Mr. Hampton and his supervisor, Ms. Tousey, made complaints to Lt. Lisa Skendandore of the Oneida Police Department based on the arrest of Mr. Hampton for Obstructing a Police Officer. Lt. Skenandore then placed Officer Harms on paid Administrative Leave pending an investigation into the allegations. After conducting the investigation, Lt. Skenandore met with Officer Harms on June 22, 2008 to discuss the results of the investigation. At this time, Officer Harms refused to listen or sign the Disciplinary Notice Form and, based on his conduct in handling the child abuse case and Mr. Hampton incident, was terminated for several infractions of the Oneida Police Department Standard Operating Procedures.

tí. Procedural background.

On June 30, 2008, Officer Harms filed an appeal to the Police Commission claiming that the Police Chief and Respondent had a conflict from a previous incident where Officer Harms filed an employee complaint against the Police Chief and others that resulted in him receiving employee protection. This filing occurred instead of taking the normal course of action and immediately appealing his decision to the Police Chief. However, on July 2, 2008, Officer Harms decided to file an appeal with the Police Chief of the Oneida Police Department, Richard G. Van Boxtel, who on July 21, 2008, upheld the termination. The Appellant then appealed his termination to the Police Commission on August 19, 2008. Following hearings on October 16, 17, and 28, 2008 the Oneida Police Commission upheld the termination of Officer Harms in its decision dated January 9, 2009.

C. Just Cause Standard

In reviewing this case, the Court has looked to whether the Oneida Police Commission properly applied the just cause standard for upholding the termination of Officer Harms. According to the Law Enforcement Ordinance Section 37.9-7, the factors to be considered are:
(a) Whether the law enforcement officer could reasonably be expected to have had knowledge of the probable consequences of the alleged misconduct.
(b) Whether the procedure the law enforcement officer allegedly violated is reasonable.
(c) Whether the Police Ghief, before filing charges against the law enforcement officer, made a reasonable effort to discover whether the law enforcement officer did, in fact, violate a procedure.
(d) Whether the investigation was fair and objective.
(e) Whether the Police Chief discovered substantial evidence that the law enforcement officer violated the procedure as described in the charges filed against the law enforcement officer.
(f) Whether the Police Chief is applying the rule of order fairly and without *100 discrimination against the law enforcement officer.
(g) Whether the proposed discipline is reasonable as it relates to the seriousness of the alleged violation and to the law enforcement officer’s record of service with the Oneida Police Department.
II Issues
Was the decision by the Oneida Police Commission Arbitrary and Capricious? Did the Oneida Police Commission deny the Appellant his right to due process and right to a fair and impartial hearing?
Ill Analysis
Was the decision by the Oneida Police Commission Arbitrary and Capricious?
No it was not. The Appellant, Officer Harms, argues that the decision upholding his termination was arbitrary and capricious for several reasons. Under the arbitrary and capricious standard, a reviewing court must consider whether an original hearing body’s decision was based on consideration of relevant facts and evidence and whether there had been a clear error of judgment. The court may reverse only when the original hearing body offers a decision so implausible that it could not be attributed to the evidence and facts presented. Thus, the scope of review under arbitrary and capricious standard is narrow, and a court may not substitute its judgment for that of the original hearing body. Oneida Bingo & Casino v. Parker, 10 O.N.R. 3-97, 04-AC-012, — Am. Tribal Law -, 2004 WL 5787793 (10/22/2004).
One of the Appellant’s arguments as to why the Police Commission’s decision was arbitrary and capricious is that Officer Harms believes that charges were improperly filed in accordance with the rights of the accused. Harms argued that this procedural violation occurred at the pre-hear-ing stage. He then cites Section 37.9-4(a) Rights of the Accused Law Enforcement Officer at Hearings:
Notice of charges that have been made, or will be made, as well as actions that will or may be taken against the individual.
Harms then further cites Section 37.9-1 (d) of the Oneida Law Enforcement Ordinance:
Disciplinary actions may be ordered by the Police Chief. The Officer may appeal a disciplinary action to the Oneida Police Commission. Upon filing of an appeal, the Police Chief shall submit formal charges against the officer to the Oneida Police Commission.
Although this claim by the Appellant falls more under the category of a due process issue, the Court has chosen to respond to this claim in the manner Appellant appealed. However, this does not change the substance of the argument. As the Appellant has cited above, “Upon filing of an appeal, the Police Chief shall submit formal charges against the officer to the Police Commission.” Officer Harms filed an appeal on August 19, 2008 with the Police Commission. In accordance with Sec. 37.9-1 (d), formal charges were filed on September 15, 2008 by Rich Van Boxtel, Police Chief of the Oneida Police Department. (Exhibit E—Formal Charges).
In other words, the proper procedures that were outlined in the Disciplinary Proceedings section of the Oneida Nation law Enforcement Ordinance were followed. What the Appellant appears to be arguing is that somewhere within those quoted sections is some timeline that was violated by not having the formal charges submitted. However, these quoted sections do not include a timeline. *101 The timeline was established at the pre-hearing conference on September 3, 2008 that required formal charges to be submitted by September 15, 2008, which occurred. Additionally, Section 37.9-5, which covers pre-hearing conferences, does not require that formal charges be filed by this point as the Appellant suggests. Moreover, it does not appear that there was any unreasonable delay in presenting formal charges by September 15, 2008 from the filing of the appeal on August 19, 2008. Finally, Appellant argues that actually 75 days had passed since he filed the appeal, which would not change the outcome, but would appear more on the unreasonable side. However, the Appellant is incorrectly using the date on which he filed an appeal to the Police Commission claiming that the Chief of Police was in conflict, which was before the Chief of Police had even rendered a decision that could be appealed.
The next issue raised by Appellant, Officer Harms, was that a supervisor in the Police Department does not have the authority to terminate Oneida Police Officers. This is different from the issue that was raised before the Oneida Police Commission which contended that Lt. Skenan-dore’s investigation violated the chain of command and that one of Officer Harms immediate supervisors should have conducted the interview. However, Officer Harms’s immediate supervisors were part of the investigation as material witnesses, which would create a conflict. Considering this conflict and that Lt. Skenandore was a supervisor of Officer Harms who received the complaint from Mr. Hampton, the assignment of this investigation to Lt. Skenandore by the Police Chief was appropriate and prudent.
On the issue of the claim by Officer Harms that a supervisor does not have the authority to terminate Oneida Police Officers, the Court will not thoroughly address this matter. A long-standing principle of appellate review is to only review issues that were raised before the original hearing body, which this issue was not. However, in an effort to be thorough, the case that is cited, Lester W. Harms v. Mark Stanchik # 004-0006, does not appear to support the assertion that Officer Harms is trying to make. Instead, this case supports the idea that a supervisor in the Police Department must be operating under the authority of the Police Chief and Assistant Police Chief in conducting investigations and handling citizen complaints. Moreover, this case points to not following procedures and instead using “past practice” as a guide, which is not what happened in the case with Officer Harms. The proper procedures were followed from the perspective of handling citizen complaints per Standard Operating Procedure: Internal Affairs 03-05-01.002: Sections 3.3 Supervisory Personnel responsibility, 3.6 Citizen Complaint Report Procedures, and 3.7 Employee Rights. Furthermore, the supervisor does have the authority to terminate an officer per Section 2.8.1.
According to Article IX of the Law enforcement Ordinance; the Chief of Police has the authority to discipline officers. The Chief of Police reserves the right to exercise that authority, but empowers all Supervisors to commence appropriate disciplinary actions against all officers according to the Law Enforcement Ordinance, Department Standard Operating Procedures, Laws of the Tribe or other Government.
2.8.1.1, This process will be initiated through a departmental chain of command, and all supervisors have been delegated the authority from the Chief of Police to take any action appropriate in regards to disciplinary action.
*102 2.81.2. All supervisors have the authority to initiate disciplinary action against employees/officers from verbal warning to termination.
Based on the above sections, the authority to terminate an officer is well within the authority of the Supervisor, who receives this authority from the Chief of Police. Moreover, Sec. VII A. of the Oneida Tribal Policies and Procedures states that enterprises and programs may establish internal rules and regulations to facilitate the administration of Tribal Personnel Polices and Procedures as long as these rules do not conflict with the Oneida Tribal Policies and Procedures and that a copy be filed with HRD. Cornelius v. Oneida Police Dept., No. 07-AC-20, — Am. Tribal Law -, 2008 WL 7438732 (Oneida Appeals 06/20/2008). Both of these requirements that were covered in Cornelius have been met in this case. Therefore, the claims that the decision was arbitrary and capricious based on the issues of supervisory authority is unpersuasive.
The next issue raised by Officer Harms is that the Oneida Police Commission erred in failing to disqualify commissioners who disclosed any possible conflict. Conflict of interest can be a serious issue, which is why the Police Commission has a Code of Conduct that is aimed at promoting high ethical standards. Included in this Code are sections that deal with the recusal of commissioners and other alternatives to recusal. Article VI of the Code covers disqualification and recusal when a commissioner’s impartiality might be questioned and requires recusal where some conflict of interest exists, potentially exists, or may be perceived to exist. Oneida Police Commission Code of Conduct at 5-3. However, Article VII of the Code also allows an alternative to disqualification and states:
A Police Commissioner who would ordinarily be disqualified may, instead of withdrawing from the proceeding, disclose on the record the basis for such possible conflict of interest. If, based on such disclosure, the parties and lawyers/advocates independently agree in writing, or on the record, that the Police Commissioner’s participation is not prejudicial, the Police Commissioner shall not be disqualified, and may participate in the proceedings. The agreement signed by all parties and advocates/lawyers shall be incorporated into the record of proceeding.
On this issue, Officer Harms, does not have a compelling argument. Commissioner Beverly Anderson declared that she sat on the Child Protective Board and that she had a shirttail relation to the custodial family. However, Commissioner Anderson was also asked if she could remain unbiased by the attorney for the Commission and she asked if there was an objection to her remaining on the hearing body. Moreover, Commissioner Van Cuyk disclosed that she worked for Indian Child Welfare in the past and that Rhonda Tous-ey was her supervisor. Finally, Commissioner Webster disclosed he had worked for Indian Child Welfare 15-17 years ago.
Considering the disclosures by the Commissioners, Officer Harms was given ample opportunity to object to these Commissioners. However, instead of objecting to any of the Commissioners, after being asked several times, Officer Harms decided to not object to any of the Commissioners. Instead, the Respondent was the party who expressed the most concern, which gave Officer Harms additional opportunities to evaluate any bias and object to a Commissioner. Now, Officer Harms claims that his mental state and lack of information at the time is what kept him from objecting to any of the Commission *103 ers, which is different from his repeated statements to the contrary. Moreover, Officer Harms had no problem in a previous case in which he raised an objection to a Commissioner that he considered might have a bias. Harms v. Oneida Police Department, No. 04-TC-059, 2004 WL 5799335 (Oneida Appeals 10/04/2004). Therefore, it does not make sense that now, given several opportunities to object to a Commissioner, he would not ask for recusal when he had done this before. Additionally, he appears to claim that members of the Commission did not appear engaged in the proceedings and further that he saw one of the Commissioners speaking with Respondent Richard Van Boxtel and Attorney Patricia Garvey. However, these claims to do not give rise to any improprieties on the part of the Commission just because they involved Commissioners and Officer Harms did not like it.
Overall, Officer Harms was given ample opportunity to object to the Commissioners who fully disclosed any relationships that could be construed as bias in accordance with the Oneida Police Commission Code of Conduct. This was the proper ethical and procedural route to follow and Officer Harms has not pointed to any bias that a Commissioner exhibited other than speculation. Therefore, the Court does not find the Appellant’s argument persuasive that these Commissioners should have been recused when he was given the opportunity to object and upholds the Commission’s decision on this issue.
Did the Oneida Police Commission deny the Appellant his right to due process and right to a fair and impartial hearing?
No. One of the Appellant’s primary claims is that his right to due process was violated during the Oneida Police Commission hearings based on a letter written by Arlene Danforth on March 2, 2009, who was on the Commission that decided his case. Commissioner Arlene Danforth also wrote a dissenting opinion in this case. Officer Harms argues that this letter proves that he was not afforded due process and that a Commissioner Jim Dan-forth, had already made up his mind when he said “we can’t allow him back to the department” during a back room encounter on the second day between hearings. This was apparently followed that afternoon by the attorney for the Commission who stated that “we can’t let him come back,” to Commissioner Arlene Danforth while she and the attorney were walking back to the hearing room. However, the letter by Arlene Danforth also discusses that she was interpreting what was said to her and the context in which the comments were made. She was unsure if these statements were trying to influence her decision, indicate that their minds were already made up, or some other reason. In other words, the statements that were made by Jim Danforth and the attorney were not so clear that she definitively knew what they indicated. This is an instance of an interpretation upon hearsay, which can change over time, and could have taken on more meaning after disagreeing with the majority decision where she said “[i]n my opinion Lester Harms III was not given due process, and that the investigation and decision was flawed from the start.” (Oneida Police Commission Dissenting Opinion at 4). Moreover, the Court does not have statements from Commissioner Danforth who allegedly made the statement or the attorney about what they said or did not say. Furthermore, it is unknown if these statements could have been made in response to considerable evidence that was presented against Officer Harms on the first day of the hearing. However, to conclude that the other three Commissioners’ minds *104 were somehow made up based on singular off the cuff remarks by a Commissioner and attorney, does not rise to the level of judicial misconduct where the Appellant’s due process rights were violated.
The next issue that Officer Harms raised was that his due process rights were violated when the Oneida Police Commission allegedly fabricated events and presented complete distortions of the facts of the case. This is certainly a weighty assertion that goes to the credibility of the Police Commission interpreting the facts and events of the case that led to the termination of Officer Harms. Through this argument, Officer Harms attempts to claim that because the Police Commission interpreted and rendered a decision based on the facts of the case, that the Commission is somehow fabricating events or facts. The Court disagrees with this assertion because the Police Commission did not fabricate events and did exactly what a hearing body is supposed to do with the facts of a case, which is hear the evidence, apply the rules and render a decision.
First, Officer Harms argues that the Police Commission fabricated facts by concluding that a thorough investigation had been conducted by Lt. Skenandore who interviewed all material witnesses and offered Officer Harms an opportunity to address the allegations, which he declined. By arriving at this conclusion, the Court does not believe that the Police Commission erred or fabricated events or was misled by the evidence. Officer Harms points to submitting to a three hour interview as cooperation; however, he also refused to sign the Disciplinary Notice that informed him of the allegations as to why he was terminated by Lt. Skenandore. More to the point, Lt. Skenandore appears to have conducted a thorough and timely investigation that chronicles all the material witness statements, the events that led to the disciplinary charges, and then followed procedural guidelines that led to the ultimate decision to deviate from progressive discipline and terminate Officer Harms.
Second, Officer Harms argues that the Police Commission did not consider his reporting of the child abuse he witnessed that led to the charge of negligent performance of his duty and unsatisfactory performance in violation of section 4.3.13 and section 5.8 of the Standard Operating Procedures. (Oneida Police Commission Decision at 17). This claim is also one of the main points of this case because the child abuse incident was the origination point of the decisions made by Officer Harms that led to his termination.
Officer Harms claims that for the April 2, 2008 incident, he completed a full and detailed report of the events that he witnessed regarding the child abuse. His actions also included contacting the Outa-gamie County child intake worker and a consultation with Sergeant Ronald King Jr. about the incident in question, which was appropriate. Officer Harms also notes Standard Operating Procedure 2.63 Child Abuse: Page 3 Section 7, which says:
Officer investigating will request assistance from his/her supervisor when he/ she has any questions as to the proper action to be taken or when evidence indicated physical abuse or neglect which seems to require immediate attention.
Officer Harms claims that since his supervisor was present at the scene that this somehow deflects his responsibility on the child abuse reporting. To further this argument, Officer Harms then refers to Standard Operating Procedure 2.63 Child Abuse: Page 3 Section C that deals with *105 Follow-up to Abuse, Neglect or Dependency Situations that says:
Lieutenant or Day Shift Commander will forward to Indian Child Welfare, and the Brown or Outagamie County Child Protection Unit, all reports of suspected child abuse, neglect or dependency. This is to be done within 24 hours of the initial complaint, exclusive of Saturdays, Sundays and legal holidays.
Officer Harms claims that this section puts the responsibility on his supervisor Lt. Skenandore to report the incident of child abuse. The Court disagrees.
What Officer Harms is failing to realize is that this section falls under the category of “Follow-up to Abuse,” which by its very meaning should be following up a prior reporting. The failure to make the original report is where Officer Harms violated his duty of reporting the child abuse incident. Well before the quoted sections argued by Officer Harms is another section that covers his responsibility as the responding officer. In Standard Operating Procedure 2.63 Child Abuse: Page 1 Section 1 under Investigation of Complaints it states:
An officer or officers will immediately investigate all urgent complaints of suspected child abuse, neglect or dependency....
Notify a Child Protection worker immediately. Indian Child Welfare will be notified in all cases....
The words are bolded and underlined as they are in the Standard Operating Procedure because of the importance to have the officer “immediately” contact these services. The obligation for someone else to follow up does not eliminate the officer’s obligation to report. Moreover, whether or not Officer Harms supervisor was present at the scene, does not relieve Officer Harms from this obligation of reporting. This is particularly true because Officer Harms’s supervisor did not witness the slapping of the child. However, the Court acknowledges that there are some discrepancies on exactly what Sergeant King’s understanding was of the incident from the many different statements and Police Commission proceedings. Moreover, exactly what was instructed to Officer Harms by Sergeant King based on his knowledge of the situation is also unclear from the transcripts. However, in the end, it was Officer Harms who was the one that believed that more was going on, which he did not effectively articulate to Sergeant King and did not report to the appropriate agencies.
As to claims that Sergeant King and Lt. Skenandore did not follow procedures, this argument could have some merit, but does not absolve Officer Harms failure to report the incident nor did it taint the termination procedures. Particularly, this could be said about the inconsistencies in Sergeant King’s statements in his incident report, interview with Lt. Skenandore and before the Police Commission. This Court does not condone these inconsistencies; however, the inconsistencies noted by Officer Harms do not change the balance of responsibility in this case. Considering these inconsistencies, if the failure to report the child abuse to the Indian Child Welfare Department was the only incident of not following procedure, Officer Harms would have a strong argument for termination being unjustified. However that is not what the facts show.
The facts show the April 2, 2008 incident was only the beginning of the misconduct that led to Officer Harms’s termination. The April 10, 2008 incident where Officer Harms returned to the Hawpetos residence, the same residence as April 2, 2008, was when more questionable behavior occurred. Out of this incident, Officer Harms had contacted Rhonda Tousey of *106 Indian Child Welfare requesting that the child be removed from the house because Ms. Hawpetos had a conviction for child abuse in 1975, of which Ms. Tousey had no record. Moreover, while at the Hawpetos residence, Officer Harms had obtained a statement from Angela Hayward at the Day Treatment Center that indicated a prior incidence of child abuse that had been reported to Mr. Hampton at Indian Child Welfare. When Officer Harms questioned Mr. Hampton about this incident, Mr. Hampton denied knowing of this incident. The next day, Officer Harms informed Ms. Tousey that Ms. Hawpetos did not have a conviction for child abuse after all, and that he intended to arrest Mr. Hampton for obstruction. Later that evening, Officer Harms interrogated Mr. Hampton about the previous child abuse incident that he denied knowing. This led to Officer Harms arresting Mr. Hampton for obstruction and he took him to Brown County Jail. However, the District Attorney declined to press charges because of flaws in the case. On April 14, 2008, Mr. Hampton and Ms. Tousey then made a complaint to Lt. Skenandore about how Officer Harms handled this case.
During the Police Commission hearing, other facts also came to light that were influential in the Police Commission’s decision. One of these facts was that the prior incident of abuse that Mr. Hampton was accused of hiding from Officer Harms happened before he was assigned that case in March of 2008. Furthermore, the incident that Officer Harms was referring to had been reported to him in a different manner that did not indicate ehild abuse. Mr. Hampton also admitted that he may have misunderstood the information, but that he did not have written information regarding the incident or could he recall receiving any information from Ms. Hayward who claimed to have told Mr. Hampton about the incident. This was supported by testimony from a foster care coordinator for Indian Child Welfare, who testified that the incident had been reported to Outagamie County, but had come back unsubstantiated. This also supports why Mr. Hampton did not have written information regarding this incident and why he would not have pursued such information. Therefore, if Officer Harms had fully investigated the history of this incident, the Court cannot see why he would have jumped to the conclusion that Mr. Hampton was lying; at most the facts point to Mr. Hampton misunderstanding the incident.
In addition, Ms. Tousey testified that the conduct of Officer Harms had reached a level that she had become afraid of him and even contacted the Green Bay Police Department. She further testified that she felt that Officer Harms “was engaged in some sort of vendetta, which was more important to him than investigating the child abuse allegations themselves.” (Oneida Police Commission Decision pg. 7).
Considering the totality of information, the Court looks to how the Just Cause standard in Law Enforcement Ordinance Section 87.9-7 was applied by the Oneida Police Commission in Officer Harms’s termination.
(a) Whether the law enforcement officer could reasonably be expected to have had knowledge of the probable consequences of the alleged misconduct.
From the evidence presented in this case in the form of testimony and reports, the Court believes that an officer should certainly be aware that the failure to report child abuse to the proper agencies could result in more child abuse and discipline for the officer. This was not Officer Harms first week on the job, but instead he had been with the Police Department for seven years. He should have *107 conducted a proper investigation into alleged incidents that included Officer Harms informing Indian Child Welfare of the abusive incidents and verifying all the information surrounding the case. Moreover, Officer Harms should have been aware that serious consequences could result from his undocumented story about Ms. Hawpetos having a prior conviction for child abuse when she did not. The seriousness and potential consequences are amplified because this fabrication came from a law enforcement officer whose information is relied upon by people in agencies such as Indian Child Welfare who may base their decisions on the assessment by police officers.
Additionally, this does not appear to be an honest mistake or clerical error on the part of Officer Harms, but a deliberate effort to manipulate the situation and those involved, which violated the rights of the accused. This can be seen in the false statement about prior abuse by Ms. Hawpetos, but also can be seen in Officer Harms early determination that Mr. Hampton had lied. This determination was made only after a cursory investigation into the matter, and Officer Harms appeared to ignore any information that contradicted his original determination that Mr. Hampton had lied. Furthermore, Officer Harms had already told Ms. Tous-ey, Mr. Hampton’s supervisor, that he planned on arresting Mr. Hampton for obstruction before Mr. Hampton had come to the station for an interview. Considering these actions and inactions on the part of Officer Harms, there is no doubt that he should have been aware of the probable consequences of conducting himself in such a manner.
(b) Whether the procedure the law enforcement officer allegedly violated is reasonable.
The procedures that the Police Department have put in place to contact the Indian Child Welfare Department when there is suspected child abuse, appears reasonable. The Police Department is trying to ensure that the child abuse is properly addressed, which by mandating that a police officer immediately report such abuse, advances the goal of protecting children. Furthermore, investigative procedures are important because they are put in place to ensure that the rights of citizens are not violated based on unsubstantiated evidence or speculation. Thus, the procedures that are in place are reasonable, and if followed, should have prevented Officer Harms from making some of the procedural and judgment errors that he made. Although the Police Commission incorrectly interpreted this section of the Just Cause Standard, the Court sees this as a harmless error. There is little doubt that Officer Harms’s actions violated reasonable procedures throughout the investigation that were meant to protect the public and instill confidence in law enforcement officers.
(c) Whether the Police Chief, before filing charges against the law enforcement officer, made a reasonable effort to discover whether the law enforcement officer did, in fact, violate a procedure.
The Police Chief in this case delegated the responsibility to Lt. Skenandore, who by all reasonable objectives conducted a thorough and complete investigation that was reviewed by the Police Chief who upheld termination. This included the interviewing of all material witnesses and the opportunity for Officer Harms to understand and be heard regarding the charges against him. The one deviation that was pointed out by Officer Harms was the changing of the violation numbers, not the actual charges, because they were incor *108 rectly numbered. This inconsistency was not significant enough to prejudice Mr. Harms. Rather, the Court considers this another example of a thorough review that the Police Chief conducted in review of Lt. Skenandore and her investigation.
(d) Whether the investigation was fair and objective.
The thoroughness in the investigation certainly indicates a fair and objective investigation even though Officer Harms claims that it was not. The primary contentions that Officer Harms appears to make is that everything that happened was not his responsibility, he is being singled out, and everyone is lying about the details of the case. Considering the record, Officer Harms has claimed that almost every material witness in the case has lied or made a false statement. This is implausible. There is no doubt that a few inconsistencies existed, but not on the wide scale conspiracy that Officer Harms is trying to portray. Some of these assertions would be more palatable if Officer Harms had admitted to making some mistakes in judgment and would have been more cooperative in the investigation. The balance of the evidence weighs against Harms and in favor of the supervisor. Furthermore, Harms was given the opportunity to explain his side of the events during the investigation, which points to the fair and objective nature of the investigation.
(e) Whether the Police Chief discovered substantial evidence that the law enforcement officer violated the procedure as described in the charges filed against the law enforcement officer.
The procedures that Officer Harms was considered in violation included Miscellaneous Prohibited Acts, Departmental Violations, and Rules of Conduct.
Section 4.3 Miscellaneous Prohibited Acts:
4.3.11 Failure to provide accurate and complete information where such information is required by an authorized person.
4.3.13 Negligence in the performance of assigned duties.
4.3.25 Failure to exercise proper judgment.
Section 4.5 Departmental Violations:
4.513 Officer violating rules of conduct.
Section 5 Rules of Conduct:
5.1 Unbecoming Conduct
5.8 Unsatisfactory Performance
5.29 Abuse of Power
After reviewing the acts and omissions by Officer Harms, there appears to be substantial evidence to sustain the charges against him. There appears little doubt that from the lack of reporting of the child abuse to the investigation that led to Mr. Hampton’s arrest, Officer Harms exhibited reckless conduct for a Police Officer. The particular incidents have been thoroughly covered in this decision, which provide substantial evidence that Officer Harms was in violation of the charges.
(f)Whether the Police Chief is applying the rule of order fairly and without discrimination against the law enforcement officer.
The Court has paid particular attention to this section of Just Cause because the allegations that Officer Harms has made about those involved are serious and would affect him receiving a fair investigation. However, a considerable amount of the allegations are pure speculation and based more on emotion than facts that can be substantiated. Nevertheless, Officer Harms does have a decent argument that the rules and procedures are not necessarily always applied uniformly. An example *109 of this is how Sergeant King was able to avoid any type of discipline when he had several inconsistencies in statements he made throughout the investigation and before the Police Commission. Another example is the lack of guidance that Officer Harms received in the arrest of Mr. Hampton, which in some respects appeared facilitated by other officers. The Court is concerned that these practices are considered acceptable where Officer Harms’s actions were not considered acceptable and resulted in termination. The Court can only conclude from this type of behavior that there is some type of double standard being applied to some of its officers. If this is the case, Officer Harms would have an argument that he did not receive a completely fair investigation where the rules were applied to him without discrimination. However, even though the Court believes that there is a double standard that should be addressed, the Court believes that the rule was applied fairly enough as to not rise to a level of discrimination. Furthermore, despite any possible inconsistencies, the facts in this case strongly support a finding that Mr. Harms violated department rules, engaged in misconduct, and deserved a severe punishment. Nevertheless, the Court would like to emphasize that without some changes to the uniformity of how the rules are applied to different officers, the decision arrived at today could be different in the future.
(g) Whether the proposed discipline is reasonable as it relates to the seriousness of the alleged violation and to the law enforcement officers record of service with the Oneida Police Department.
Police officers hold a distinct and unique role in communities that expect them to uphold and enforce the law. If an officer cannot perform to this standard, the community can lose faith in the police, which endangers all members. For these reasons, the response to a police officer violating the rules and procedures put in place for the safety of the community should be swift and clear. When an officer exhibits such lack of judgment in the course of his duties, a serious punishment is just. In this case that punishment was termination, which is obviously a severe punishment, but a justified outcome based on Officer Harms actions and inaction. Furthermore, the termination was within the police department’s authority and discretion, which felt that this was a justified punishment for the violations.
Based on this review, the Court concludes that the termination of Officer Harms was a justifiable decision that was made after a thorough investigation that included substantial evidence that Officer Harms violated the provisions for which he was charged. Furthermore, the Oneida Police Commission conducted a hearing that considered the many complexities present in this case before rendering a decision. In an effort to properly respond to the Appellant, this Court has considered and addressed the many issues that were raised on appeal. However, the Court is not persuaded that the Appellant was denied his due process or that the Oneida Police Commission’s decision was arbitrary or capricious.
Despite the ultimate favorable decision for the Oneida Police Department, this decision does not condone the Department’s handling of all aspects of this case. The Police Department should carefully look at its Standard Operating Procedures and how it can improve these standards to avoid future conflicts. There is little doubt that officers either did not properly apply, or were not fully aware, of several of the procedures involved in this case. This applies to Officer Harms, as well as others *110 involved in the investigation, who did not follow procedures that involved the alleged abuse of a child. This type of investigation cannot be considered acceptable when a child’s safety is at stake, nor should it be acceptable when the community relies on officers making the correct decisions. Therefore, the Court recommends to the Oneida Police Department that it review its procedures and conduct any additional training or re-training of its officers to include department wide sensitivity training, so this type of behavior is not duplicated in the future.
IV Decision
The Court believes there was just cause to terminate Officer Harms and upholds the decision by the Oneida Police Commission.